**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SHERRY LYNN JOHNSTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-16-3215 |
| | § | |
| DAVID DEXEL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Sherry Lynn Johnston's elderly mother, Willie Jo Mills, died in a nursing home. Johnston alleges that Mills received improper and negligent care that led to her death. Johnston asserted a long list of claims against a number of defendants, all of whom she alleged played some role in hastening or causing Mills's death. The defendants moved to dismiss and, based on those motions, the court dismissed each defendant except for David Dexel and Judge Christine Butts. Johnston's only remaining claims are fiduciary-duty breach against Dexel and "gross neglect," TEX. EST. CODE § 1201.003, against Judge Butts.

Dexel and Judge Butts have each moved for summary judgment. Dexel argues that he did not have a fiduciary relationship with Johnston; that Johnston lacks capacity to assert Mills's survival claims under Texas law; and that Johnston has not submitted or identified evidence showing that Dexel breached any fiduciary duty he owed to Johnston or Mills. Judge Butts argues that Johnston lacks capacity to sue under Texas Estates Code § 1201.003 and that Johnston has not submitted or identified evidence supporting an inference that Judge Butts acted with gross neglect in failing to reasonably perform her duties.

Johnston responded that: she has capacity to assert Mills's survival claims against Dexel

because the estate administration has been closed; Mills and Dexel were in a fiduciary relationship; and Dexel violated fiduciary duties owed to Mills. As to Judge Butts, Johnston argued that: the Texas Estates Code, § 1201.003, provides a cause of action to any person who is "damaged" by a probate judge's gross neglect, and that the evidence submitted with her second amended complaint supports an inference that Judge Butts did act with gross neglect. Judge Butts and Dexel both replied.

The court ordered briefing on whether the case should be remanded given that all Johnston's federal-law claims have been dismissed. Dexel and Judge Butts opposed remand, but Johnston endorsed it.

Based on a careful review of the second amended complaint, the court's prior rulings, the motions, the responses, the replies, the supplemental briefing, the record evidence, and the applicable law, summary judgment is granted for Judge Butts. The court finds that the statutory and common-law factors favor remanding the remainder of the action to the 253rd Judicial District Court of Liberty County, Texas. The reasons are explained in detail below.

## I.     Background

In 1999, Mills had a stroke that paralyzed the right side of her body, leaving her unable to work. Mills had another stroke in 2007, which severely impaired her motor abilities and left her in need of fulltime living assistance. In 2008 and 2009, four doctors separately examined Mills and found that she had moderate to severe dementia, concluding that she could not make reasonable decisions or care for herself. (Docket Entry No. 10-12 at 25–38).

In 2008, Johnston and her sister, Cindy Pierce, sued their brother, Larry Mills, for converting Mills's property and financial assets. A court investigator's June 2008 report found that Johnston

was Mills's preferred guardian. A year later, the presiding probate judge appointed Howard Reiner as Mills's attorney ad litem and David Dexel as temporary guardian of the person and estate. Johnston, Pierce, and Larry Mills signed a family settlement agreement. As part of that agreement, the probate judge appointed Dexel as Mills's guardian of the person on a continuing basis.

Dexel hired Ginger Lott and GSL Care Management, LLC to manage Mills's care. Between 2009 and 2012, Johnston frequently visited Mills at Silverado, the nursing home where Mills resided. In 2012, Silverado changed management, and Johnston perceived a decline in the quality of Mills's care. Beginning in 2012 and into 2013, Johnston complained to Dexel about her mother's care. Mills was hospitalized several times with urinary tract infections. Johnston complained that the infections resulted from poor medical care, but Dexel did not move Mills to a different nursing home. The relationship between Johnston and Dexel deteriorated.

In May 2013, Dexel moved Mills to a section of Silverado that provided high-level care. According to the second amended complaint, this section's residents had behavioral issues and were aggressive toward Mills. That month, Johnston's protests about how Silverado was treating Mills led it to ban Johnston from the premises.

In June 2013, Mills fell out of her wheelchair, breaking several bones in her right leg. Dexel discontinued Mills's physical therapy during her recuperation. Johnston alleges that this made Mills's muscle problems worse. That same month, Dexel allegedly made an "illegal, *ex parte*, oral motion"—that he filed in writing in the public records of the probate court three days later—to have Clarinda Comstock appointed as Mills's guardian ad litem. (Docket Entry No. 38 at 23). Judge Butts, the presiding probate judge, granted the motion, instructing Comstock to investigate Mills's condition and treatment and to report her findings to the court.

Mills continued to deteriorate. By September 2013, she could no longer hold a cup or fork, had lost 30 to 40 pounds, and suffered from recurring urinary tract infections. Johnston continued to demand that Dexel move Mills to a different nursing home and threatened to ask the court to remove Dexel as Mills's guardian. In response, Dexel filed an application to resign and to have the court appoint a successor guardian.

On September 13, 2013, Dexel notified the interested parties—including Johnston—of a hearing set for September 24, 2013. On September 16, 2013, Comstock filed a report about Mills's condition and treatment, finding that "Ms. Mills has had good care and has enjoyed living at Silverado Kingwood since moving there in 2009, and she has become close to many of the staff members and other residents." (Docket Entry No. 10-12 at 1). Comstock concluded that moving Mills "would be very difficult at the current stage of life of this very fragile woman." (*Id.*). But at that time, Silverado had "made the decision that Ms. Mills may not remain in their facility due to the on-going disruptions caused by Ms. Johnston's behavior when visiting Ms. Mills and by postings made online." (*Id.* at 2). Because of Mills's eviction and Dexel's resignation, Comstock recommended that the court "immediately" appoint "a successor third-party guardian" to "locate an appropriate residential facility for Ms. Mills to ensure her safety and well being," considering "as much as possible her medical, social[,] and emotional needs." (*Id.* at 2, 24).

Johnston alleges that on September 17—one week before the probate-court hearing date—Dexel, Lott, Comstock, and Judge Butts had an "illegal, *ex parte* meeting," during which Judge Butts accepted Dexel's resignation and appointed Lott as Mills's successor guardian. (Docket Entry No. 38 at 31).

In October 2013, Lott moved Mills from Silverado to the Hampton Nursing Home. In

December 2013, Pierce filed an emergency application for a temporary restraining order, alleging that Lott was neglecting Mills's care and that she needed to be immediately removed from the guardian position. (Docket Entry Nos. 10-13–10-14). Less than two weeks later, Judge Butts held a hearing at which Johnston and Pierce testified as to Mills's care, and the parties presented argument. (Docket Entry No. 10-15). The court found no basis to immediately remove Lott, but directed the parties to submit a docket-control order to try the issue. (*Id.* at 126, 138, 151–53). During the hearing, Johnston, Pierce, and Lott reached an agreement that Johnston and Pierce would receive regular updates on Mills's care and that Johnston's visitation rights would be reinstated. (*Id.* at 140–41).

Johnston alleges that, in March 2014, Mills's doctor advised Lott that Mills needed to see a cardiologist and an endocrinologist, but Lott failed to set up the appointments. The following month, April 2014, Johnston sent Lott a text message stating that Mills "was delirious and unresponsive with pus in her catheter" and needed to go to the emergency room immediately. (Docket Entry No. 38 at 36–37). Lott did not respond to Johnston's text. Johnston called 911 and paramedics arrived in an ambulance. Lott allegedly told the Hampton's personnel to send the paramedics away and called a separate ambulance. Although Lott was the only person with legal authority to sign Mills into the hospital, Lott allegedly never went to the hospital, leaving Mills to sign herself in.

In late April, Pierce filed a second emergency application for a temporary restraining order against Lott which, similar to the first emergency application, alleged that Lott was neglecting Mills's care. (Docket Entry No. 10-16). Sherrie Fox, Judge Butt's guardianship coordinator, informed Johnston's and Pierce's counsel that the "court will not be scheduling a hearing on the

[second emergency application]" because the "court does not see an emergency and the case will be tried within two weeks." (Docket Entry No. 38-15).

On September 27, 2014, while the guardianship dispute remained ongoing, Mills died. Johnston alleges that she died of starvation after Lott ordered the nursing home staff to withhold food and give Mills nothing but prunes, water, and thickened water.

Johnston sued in the 253rd Judicial District Court of Liberty County, Texas, in September 2016. The defendants removed to federal court, Johnston filed an amended complaint, and the defendants moved to dismiss. (Docket Entry Nos. 1, 10, 17, 20, 21, 24). In August 2017, the court issued a Memorandum and Opinion granting in part the defendants' motions to dismiss and granting Johnston leave to file a second amended complaint as to some of the claims. (Docket Entry No. 32).

Johnston filed a second amended complaint; the defendants moved to dismiss; Johnston responded; the defendants replied; and Johnston sought leave to file a third amended complaint. (Docket Entry Nos. 38, 43, 45, 46, 47, 49, 52, 53, 56, 57–59, 61). In May 2018, the court issued a Memorandum and Opinion denying Johnston leave to amend and granting the defendants' motions to dismiss in part. (Docket Entry No. 67). The court granted Comstock's and Harris County's motions to dismiss, granted Dexel's motion to dismiss in part, and denied Judge Butts's motion to dismiss. (*Id.* at 16). These Memoranda and Opinions dismissed the federal-law claims, with prejudice. Two claims remained: a breach of fiduciary duty claim against Dexel, and a gross neglect claim against Judge Butts under Texas Estates Code § 1201.003. (*Id.* at 9, 13–16).

Dexel and Judge Butts have each moved for summary judgment. (Docket Entry Nos. 78–79). Dexel argued that he had no fiduciary relationship with Johnston and that, even if he did, he had not breached one. (Docket Entry No. 79 at 9–11). Dexel contended that Johnston lacked the capacity

to assert claims based on his fiduciary relationship with Mills. (*Id.* at 11). Assuming that Johnston could assert the claims, Dexel argued that she did not raise a genuine factual dispute material to finding no breach of any fiduciary duty to Mills. (*Id.* at 9–10). According to Dexel, claim preclusion bars Johnston's claims because the probate court approved Dexel's actions and fee applications, and Johnston had an opportunity to contest them but did not do so. (*Id.* at 12–13).

Judge Butts argued that Johnston lacked the capacity to sue her under Texas Estates Code § 1201.003 because she was not Mills's estate administrator. (Docket Entry No. 78 at 7–8). Even assuming that Johnston could sue, Judge Butts contended that Johnston had not submitted or identified evidence supporting an inference that Judge Butts acted with gross neglect in failing to perform her statutory duties. (*Id.* at 8–10).

Johnston responded that she had the capacity to sue Dexel because Mills's estate administration had closed in June 2015; that the documents submitted with her second amended complaint and Dexel's motion for summary judgment show a genuine factual dispute material to whether Dexel violated a fiduciary duty he owed to Mills; and that claim preclusion does not bar her claims. (Docket Entry No. 88 at 1–14). Johnston argues that there is a genuine factual dispute material to determining whether Judge Butts acted with gross neglect because she declined to hold hearings on Lott's guardianship or on Mills's medical condition. (*Id.* at 15). Johnston submitted a probate-court order that dropped Mills's estate administration from the court's "active docket" in June 2015, along with Dexel's final report and application to be discharged as guardian filed with the probate court, Judge Butts's approval of Dexel's final report, and a $100 bond Lott posted. (Docket Entry Nos. 88-2–88-5).

Dexel and Judge Butts each replied. Dexel maintained that Johnston lacked the capacity to

assert Mills's survival claims because she was not the estate executor, and because claim preclusion barred her challenge to Dexel's actions and fees. (Docket Entry No. 92 at 3). Dexel argued that Johnston's response referred to documents in the record without articulating how those documents supported an inference that he breached a fiduciary duty owed to either Johnston or Mills. (*Id.* at 5–6).

Judge Butts argued that Johnston had not identified evidence supporting an inference that Judge Butts acted with gross neglect in declining to hold emergency hearings on Johnston's motions for a temporary restraining order in probate court. (Docket Entry No. 91 at 2). Judge Butts pointed out that she had held a hearing on the matters raised in Johnston's restraining-order applications, requested supplementary reports from Comstock, and set a docket-control order to try whether Lott should be removed as Mills's guardian. (*Id.* at 3–5).

This court ordered supplemental briefing on whether the action should be remanded to state court. The court noted that Dexel's claim-preclusion defense raised an unsettled Texas-law question about the status of an "interested person" in Texas probate court. (Docket Entry No. 93 at 5–6 (quoting TEX. EST. CODE § 1002.018)).

Dexel, Judge Butts, and Johnston each briefed the remand issue. Dexel contended that the court should not remand because: the parties have sunk substantial time and expense into the litigation; the court is familiar with the facts and arguments; Johnston has not submitted or identified evidence that Dexel breached a fiduciary duty; and Johnston has asserted a survival claim, which only Mills's estate administrator may do under Texas law. (Docket Entry No. 95 at 2–5). Judge Butts also asked the court not to remand, pointing out that this litigation had consumed substantial time and expense, and contending that Johnston lacks the capacity to sue and has not identified

8

evidence supporting an inference that Judge Butts acted with gross neglect. (Docket Entry No. 94 at 2–3). Johnston responded that the court should remand the case because "there are important, difficult Texas law questions upon which the Texas Courts have not spoken that are issues which impact the ultimate resolution of this case." (Docket Entry No. 96 at 1).

The parties' arguments and responses are examined below in light of the record and the applicable legal standards.

## II. The Legal Standards

### A. Supplemental Jurisdiction

A federal court that has original jurisdiction may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action" that "they form part of the same case or controversy." 28 U.S.C. § 1367(a). When a court has dismissed the federal claims that establish subject-matter jurisdiction before trial, the court may, and often should, remand the remaining state-law claims. *Batiste v. Island Records Inc.*, 179 F.3d 217, 226–27 (5th Cir. 1999); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992). "District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed." *Heggemeier v. Caldwell Cty., Tex.*, 826 F.3d 861, 872 (5th Cir. 2016) (quoting *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993)).

The district court may decline to retain the state-law claims when they raise novel or complex state-law issues, substantially predominate over the federal claims, the federal claims have been dismissed, or exceptional circumstances or other compelling reasons are present. 28 U.S.C. § 1367(c); *Enochs v. Lampasas Cty.*, 641 F.3d 155, 158–59 (5th Cir. 2011). Generally, "a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims

are eliminated before trial." *Heggemeier*, 826 F.3d at 872 (quoting *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009)). The court has discretion to retain supplemental jurisdiction over the state-law claims, even after the federal claims are dismissed, if the statutory and common-law factors support that result. *Enochs*, 641 F.3d at 158–59.

In deciding whether to remand remaining state-law claims based on these factors, the court must consider the "common law factors of judicial economy, convenience, fairness, and comity." *Brookshire*, 554 F.3d at 601–02. Judicial economy concerns include whether the district judge "had substantial familiarity with the merits of the case," and whether "further proceedings in the district court would prevent redundancy and conserve scarce judicial resources." *Mendoza v. Murphy*, 532 F.3d 342, 347 (5th Cir. 2008) (quotations omitted). The convenience factor asks if remand to state court would facilitate the litigation, given the location of "the parties, witnesses, and evidence." *Enochs*, 641 F.3d at 160. "The fairness factor concerns the prejudice to the parties that would arise from dismissal." *Parsley*, 972 F.2d at 588. Comity requires that "'important interests of federalism and comity' be respected by federal courts, which are courts of limited jurisdiction and 'not as well equipped for determinations of state law as are state courts.'" *Enochs*, 641 F.3d at 160 (quoting *Parsley*, 972 F.2d at 588–89).

"An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." 28 U.S.C. § 1447(d). A district court's "determinations accompanying remand orders are reviewable . . . . if the decision is 'separable' from the remand order and independently reviewable under the collateral order doctrine." *Certain Underwriters at Lloyd's, London v. Warrantech Corp.*, 461 F.3d 568, 576–77 (5th Cir. 2006) (quotation omitted). "A decision is 'separable' if (1) the decision preceded the remand order in logic and in fact such that

it was made by the district court while it had control of the case; and (2) the decision is conclusive—that is, functionally unreviewable in state courts." *Id.* (quotations omitted).

## B. Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (quotation omitted); *see also* FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Savant v. APM Terminals*, 776 F.3d 285, 288 (5th Cir. 2014)). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). A fact is material if "its resolution could affect the outcome of the action." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, [the summary-judgment motion] must be denied,

regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007).

## III. Analysis

The court has discretion to retain subject-matter jurisdiction over the Texas-law claims, considering the statutory and common-law factors. *See Burciaga v. Deutsche Nat'l Tr. Co.*, 871 F.3d 380, 384 (5th Cir. 2017) ("The court must address challenges to subject-matter jurisdiction before reaching the merits of a case."); *Topper v. Progressive Cty. Mut. Ins. Co.*, 598 F. App'x 299, 300–01 (5th Cir. 2015) (per curiam) ("[A] district court is unable to reach the merits of claims over which it has no subject matter jurisdiction."). Considerations applicable to both claims are considered first.

Johnston's federal-law claims were dismissed in a series of motions to dismiss, and only state-law claims remain. This fact weighs strongly in favor of remand. 28 U.S.C. § 1367(c)(3);

*Parsley*, 972 F.2d at 585 ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed.").

The time and work that the parties and court have put into this case support retaining jurisdiction. The case has been with this court for more than two years. During this time, the court has decided multiple motions to dismiss; allowed Johnston to amend her complaint twice, but not a third time; received and reviewed Dexel's and Judge Butts's summary-judgment motions; and requested supplemental briefing on jurisdiction. Counsel for the parties appeared for scheduling conferences, and the court entered docket-control orders after each conference. Trial was set for February 2019, but that time has come and gone. Much work has been done, giving this court extensive familiarity with the pleadings, record evidence, and the issues.

On remand, the state court would have to study this case's complex pleadings, procedural history, and record evidence. That said, the court notes that the parties may use any discovery already taken, and the extensive motions and briefs already filed, in state court. Their summary-judgment motions and responses will help frame the issues on remand. This court's Memoranda and Opinions will enable a new judge to quickly learn the case. These considerations ameliorate some of the judicial economy concerns, but they do not eliminate the work that would confront the state court. The judicial economy factor weighs in favor of retaining jurisdiction, but not so heavily as to decide the matter.

The parties have not raised arguments about the convenience of litigating in the 253rd Judicial District Court of Liberty County, Texas, and that factor appears to be neutral given that Houston and Liberty County are not far apart. Nor have the parties argued that remand would be unfair. Because the action would be remanded, not dismissed, Johnston's claims are not at risk of

being time-barred, and this court's substantive decisions would bind the Texas court if it found that preclusion applied.[1] The unfairness factor is neutral.

Another important factor, under both § 1367 and common law, is the presence of novel or complex state-law questions. The Fifth Circuit has found that this factor weighs "dramatically in favor of remand" when a "lawsuit touches on multiple issues of state importance while impacting no federal policy." *Watson v. City of Allen, Tex.*, 821 F.3d 634, 642 (5th Cir. 2016). This is true even if the federal court spent extensive time deciding "many motions to dismiss." *Id.* Because the claims against Judge Butts and Dexel raise different state-law questions, the court considers them separately.

## A. The Claim Against Judge Butts

### 1. Supplemental Jurisdiction

Johnston's claim against Judge Butts under Texas Estates Code § 1201.003 does not present difficult or novel Texas-law questions. Section 1201.003 concerns a probate judge's liability for actions taken in a judicial capacity.

On taking office, Texas probate judges have to provide a $500,000 bond, payable to the country treasury. TEX. GOV'T CODE § 25.00231(b). While a probate judge generally enjoys immunity for judicial actions, he or she is liable "to those damaged if damage or loss results to a

---

[1] A district court's "substantive" decisions before remand have "preclusive effect in state court; a 'jurisdictional' finding can be reviewed by the state court upon remand." *Doleac ex rel. v. Michalson*, 264 F.3d 470, 487 (5th Cir. 2001) (citing *Linton v. Airbus Industrie*, 30 F.3d 592, 596 (5th Cir. 1994)); *see Allen v. Union Standard Ins. Co.*, No. 11-12-233-CV, 2013 WL 4715972, at *4 (Tex. App.—Eastland Aug. 30, 2013, no pet.) ("When a federal district court dismisses a suit for lack of subject-matter jurisdiction, the disposition is 'without prejudice on the merits, which are open to review in state court to the extent the state's law of preclusion permits.'" (quoting *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004)); *Heartland Holdings, Inc. v. U.S. Tr. Co. of Tex. N.A.*, 316 S.W.3d 1, 10 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("We consider the preclusive effect of a federal-court judgment pursuant to federal common law.").

guardianship or ward because of the gross neglect of the judge to use reasonable diligence in the performance of the judge's duty." TEX. EST. CODE § 1201.003. The judge's liability under § 1201.003 cannot exceed the $500,000 bond. *See Twilligear v. Carrell*, 148 S.W.3d 502, 505 (Tex. App.—Houston [14th Dist.] 2004, no pet.). This immunity waiver permits "recovery for losses directly tied to the judge's duties," including "the use of reasonable diligence to determine whether an appointed guardian is performing the required duties, to at least annually examine the well-being of each ward and the solvency of the appointed guardian's bond, to require new bonds from appointed guardians when necessary, and to request the production of identifying information." *James v. Underwood*, 438 S.W.3d 704, 714 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing TEX. EST. CODE § 1201.001–.004).

Judge Butts argues that Johnston cannot sue her under Texas Estates Code § 1201.003 because any claim under that section belongs to Mills, and only her estate administrator has the capacity to assert it. That argument is not supported by § 1201.003, which states that a probate judge "is liable on the judge's bond to those damaged" from "the gross neglect of the judge to use reasonable diligence in performance of the judge's duty." TEX. EST. CODE § 1201.003; *see Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) ("Our objective in construing a statute is to give effect to the Legislature's intent, which requires us to first look to the statute's plain language."). This language does not limit recovery to the guardian or the ward, but makes the judge liable to anyone "damaged" by the judge's harm to the ward. Under Texas law, a party has the capacity to sue "when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996). Because Johnston claims to have been damaged by the harm that Judge Butts caused

Mills, Johnston has the capacity to assert a claim under § 1201.003.

Judge Butts argues that § 1201.003 does not waive immunity for "[g]ranting or denying motions" because probate judges have no duty to decide motions. (Docket Entry No. 78 at 9). A probate judge is obligated to "use reasonable diligence to determine whether a guardian is performing all of the duties required of the guardian," and to annually "examine the well-being of each ward." TEX. EST. CODE § 1201.001–1201.002(a). This duty to exercise reasonable diligence might require the probate judge to timely decide, or promptly hear, a motion raising well-founded concerns about a ward's condition or a guardian's duties. *See* TEX. EST. CODE § 1053.101(2) ("The judge in whose court a guardianship proceeding is pending, as determined by the judge, shall . . . issue necessary orders."). Because a probate judge must exercise reasonable diligence in performing statutory duties, and concerns about the ward or guardian will often be brought before the judge by motion, the judge's failure to act on a motion could support a finding of "gross neglect of the judge to use reasonable diligence." TEX. EST. CODE § 1201.003.

The remaining question as to Judge Butts is whether Johnston has submitted or identified evidence showing a factual dispute material to whether Judge Butts acted with gross neglect in failing to reasonably perform her duties. FED. R. CIV. P. 56(a). This question does not implicate complex or novel questions of Texas law, and the court has much experience both with the legal standard and the parties' evidence. Because of the substantial work that Johnston, Judge Butts, and the court have put into this claim, and the absence of a complex or novel Texas-law question, the court finds that judicial economy justifies retaining jurisdiction to rule on Judge Butts's motion for summary judgment, even though the federal-law claims have been dismissed.

## 2. The Motion for Summary Judgment

As a threshold matter, Johnston contends that to prevail on summary judgment, Judge Butts

must point to "specific evidence which [Johnston] lacks in support of her claims." (Docket Entry No. 88 at 2). If a party moving for summary judgment points to the "absence of evidence," that shifts the burden to the nonmoving party to demonstrate "by competent summary judgment proof that there is an issue of material fact warranting trial." *Nola Spice Designs*, 783 F.3d at 536 (quoting *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995) (per curiam)).

Johnston alleges that Judge Butts took "no action" in response to her emergency-relief requests. (Docket Entry No. 88 at 15). She alleges that Judge Butts "'turned a blind eye' to the danger to Mills" even after being presented "with undeniable proof of Mills'[s] rapidly deteriorating health and medical condition." (Docket Entry No. 38 at 5–6). According to Johnston, Judge Butts failed to require Lott to perform guardian duties and failed to holding a hearing on the second emergency application, "which a reasonably diligent judge would have [done]." (*Id.* at 6–7). Johnston alleges that Judge Butts had illegal, *ex parte* communications with Dexel and Lott to appoint Lott as the guardian, without notifying Johnston or her sisters. (*Id.* at 48–49).

In support, Johnston directs the court to Pierce's emergency application for a temporary restraining order against Lott, filed in December 2013; Pierce's second emergency application for a temporary restraining order against Lott, filed in April 2014; photographs of Mills between 2012 and 2014; and an email from Sherrie Fox, the probate court's guardianship coordinator, stating that the court denied a hearing on the second application. (Docket Entry No. 88 at 15). Judge Butts responded that this evidence does not support a reasonable inference that she acted with gross neglect. (Docket Entry No. 91 at 2–5). She is correct.

Gross neglect, or gross negligence, means "that entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the right or welfare of the person or persons to be affected by the conduct." *Inn of Hills, Ltd. v. Schulgen*

& *Kaiser*, 723 S.W.2d 299, 301 (Tex. App.—San Antonio 1987, writ ref'd n.r.e) (citing *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981)); *see also* TEX. CIV. PRAC. & REM. CODE § 41.001(11). "[W]hat separates ordinary negligence from gross negligence is the defendant's state of mind; in other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999).

Section 1201.003 makes probate judges liable for "gross neglect" to "use reasonable diligence in the performance of the judge's duty under this subchapter." The subchapter in which § 1201.003 is located places only a few duties on probate judges. Relevant here, a probate judge must "use reasonable diligence to determine whether a guardian is performing all of the duties required of the guardian that relate to the guardian's ward." TEX. EST. CODE § 1201.001. At least once a year, the judge must "examine the well-being of each ward of the court and the solvency of the bond of the guardian of the ward's estate." *Id.* § 1201.002(a). On a finding of necessity, a probate court may "immediately accept the resignation of a guardian and appoint a successor guardian," without notice or a hearing. *Id.* § 1203.002(a).

In a status conference following Lott's appointment and Pierce's first emergency application, with all the parties present, Judge Butts explained the necessity for appointing Lott without notice or a hearing:

> When Mr. Dexel voiced his desire to be—to decline to serve as guardian of Ms. Mills, part of the reason he did that is because Silverado was not allowing Ms. Mills to stay there anymore. . . . [W]e tried to work with Silverado and ask[ed] to keep Ms. Mills there for a little bit longer, but they refused. And so—and Mr. Dexel was saying, 'I want to resign.'
>
> So, when he resigned, we had an emergency situation because Ms. Mills was being kicked out of Silverado, and she need[ed] a placement immediately, and that's when Ms. Lott stepped up and said that she would serve as a guardian. And we didn't have

18

an application for guardianship on file from the family members. And when we looked at the past history of the file, it showed just a lot of disharmony among the family members. . . . [I]t seemed like that needed to be worked out before we could, you know, have a family member appointed.

(Docket Entry No. 10-15 at 128–29). Judge Butts continued:

Ms. Lott, apparently, has worked with [Mills] for a long time. And it seems like, you know, it's only recently after May 16 that things have really, you know, taken a turn for the worse. And so, hopefully, you know, we can, number one, my apology for not having a hearing when we appointed Ms. Lott, you know, just—that's our fault; it's not your fault; it's not your attorney's fault; it's not [Dexel's or Lott's] fault; it's our fault. You know, we should have, perhaps, thought it through a little bit better. But we were facing a woman that we felt like was being evicted from Silverado and had no placement, and she was losing her guardian. So, we considered that an emergency. And perhaps we should have been more open about the appointment of Ms. Lott.

Now I'm not saying that's what the statute requires, but I think that would have been the more human[e] and reasonable thing to do, and I'm sorry that we didn't do that.

(*Id.* at 131). Judge Butts later reiterated that she had the authority to appoint Lott as guardian without notice or a hearing, but that it was not "the right thing to do," in hindsight. (*Id.* at 144).

In September 2014, Judge Butts was confronted with Mills's fragile condition and her eviction from Silverado. Dexel had submitted his resignation, and Silverado refused to allow Johnston on its premises. Comstock had recommended that Judge Butts immediately appoint a third-party guardian to locate a new residence for Mills and to move her from Silverado. Judge Butts summarized the situation: "I saw a family in disharmony. I saw a woman being evicted, and I saw an emergency need for placement. And I was told that this woman would probably not survive the transfer." (*Id.* at 145).

Under these circumstances, Judge Butts found the necessity to name a new guardian, and named Lott, reasoning that Lott had experience managing Mills's care and was familiar with her family. Judge Butts's decision was a reasonable one, and she had ample authority to make it. The

record does not support an inference that Judge Butts acted with gross neglect in failing to perform her duties as to Lott's appointment.

Johnston's remaining allegations relate to Pierce's emergency applications. On December 6, 2013,[2] Pierce filed an emergency application for a temporary restraining order against Lott, alleging that Mills "was just released from the hospital and her health is on an urgent, *steep decline* in sharp contrast to the health she enjoyed when her daughter, Sherry Johnston[,] was permitted to visit her and care for her daily." (Docket Entry No. 10-14 at 5 (emphasis in original)). Pierce alleged that Mills's deterioration resulted from Lott's disregard for her well-being. (*Id.* at 8–10). Through the temporary restraining order, Pierce sought reinstatement of Johnston's visitation rights and to have Lott removed as guardian. (*Id.* at 40–41). To support the temporary restraining order, Pierce submitted her affidavit and an affidavit from Johnston. (*Id.* at 1–2).

On December 16, Judge Butts held a live status conference, at which the parties and Judge Butts discussed Mills's well-being and the allegations against Lott. (Docket Entry No. 10-15). The conference was on the record. Judge Butts told the parties:

> For me, the question to answer today is, is Ms. Mills okay? If she's okay, i[f] no immediate action is required, then you guys can move forward with any action to remove Ms. Lott that you wish, but that will have to be done in a formal process.
>
> If Ms. Mills is not okay, if it requires immediate action on my part, then I'll need to decide what action to take. And, so that's really the focus, you know—that's the focus that I concluded . . . would be appropriate for our status conference.

(*Id.* at 17–18). Judge Butts summarized Pierce's position:

> [T]his emergency is because Ms. Mills is not coherent or she's not as coherent as she used to be. She's sad and depressed. She's got skin tears on her arms and legs; her foot is broken, and the doctor has said it's not worth setting. She had—and they haven't gotten a second opinion on that; that she has bed sores; she's suffering from

---

[2] Pierce amended her emergency application on December 9, 2013.

pneumonia; and she has scratches on her arms and she's lost weight.

(*Id.* at 40).  Judge Butts asked if there were other safety or health conditions, and Pierce's counsel stated that Mills is "taking insufficient fluids and foods."  (*Id.* at 40–41).  Judge Butts then permitted counsel to examine and cross-examine Pierce and Johnston as to their allegations regarding Mills's condition and care.  After hearing the testimony and arguments, Judge Butts concluded:

> Okay.  Well, as we all know, we're not here for the TRO.  I mean, we're here, really, essentially, to determine whether or not the guardian has neglected or cruelly treated the Ward.  That's really the only authority that I have to remove her at this moment.

> And I have to say, based upon the evidence that you guys have presented, I don't see that there's an emergency situation number one; and number two, I don't find that the guardian has neglected or cruelly treated the Ward.

> The point about visitation, though, I think is something that needs to be addressed.  And you guys are free to present the case as you wish, but I will tell you, at this moment, I'm just not—I don't see that we're in an emergency situation that would necessitate the immediate removal of Ms. Lott based upon the allegation that she's neglected or cruelly treated the Ward.  And so—but you guys are welcome to put on whatever testimony or evidence you wish. . . .

> I haven't heard any evidence as to neglect.  I mean, it sounds like Ms. Mills has sitters with her, and at least one of the sitters, Nicole, is suitable.  And that was the testimony of Ms. Pierce.

> And Raylene, apparently, is more interested in watching game shows.  So, that may be something that needs to be addressed, but it doesn't constitute neglect, necessarily.  And she may have hit her head on the wheelchair, and that's unfortunate.  And I completely—you know, if it were my mother, I would be, perhaps, doing the same thing that you guys are doing.  I don't want you to think that I don't sympathize with your position—it's just that I only have so much—at this point, I can only remove her if I find that she's neglected her or cruelly treated your mother, and I just don't see evidence of that.

(*Id.* at 125–26).

The court addressed Johnston's visitation rights and the appropriate communications among Lott, Pierce, and Johnston.  Lott agreed to permit Johnston to visit Mills once a week.  (*Id.* at 134).  Lott also agreed to email Johnston and Pierce "if there's any major changes or even minor changes

in [Mills's] condition" and to "every month, send them an email, just a status, even if nothing's changed" in Mills's care and condition. (*Id.* at 135).

At the conference's close, the court and parties agreed to submit a proposed docket-control order to resolve Pierce's request to remove Lott as guardian. (*Id.* at 153). On January 31, 2014, the parties submitted an agreed docket-control order, stating that the parties would have a joint pretrial conference on May 9, 2014, and would try the issues related to Lott's guardianship on May 19. (Agreed Order, *Estate of Willie Jo Mills*, No. 380624 (Prob. Ct. No. 4, Harris Cty., Tex., Jan. 31, 2014)).[3]

On April 28, 2014, Pierce filed a second emergency application for a temporary restraining order against Lott, again asking the court to remove Lott as guardian because of alleged acts or omissions relating to Mills's care. (Docket Entry No. 10-17). The allegations as to Lott's neglect of Mills were similar to the first emergency application. (*See* Docket Entry No. 10-14 at 8–10; Docket Entry No. 10-17 at 15–18). On May 5, Judge Butts's guardianship coordinator emailed Pierce's counsel, stating that the court "will not be scheduling a hearing on the [second emergency application]" because the "court does not see an emergency and the case will be tried within two weeks." (Docket Entry No. 10-20). Johnston alleges that Judge Butts's decision not to hold a hearing on the second emergency application supports finding an inference of gross neglect.

Judge Butts did not act unreasonably, let alone with gross neglect, by declining to immediately hold a hearing on the second emergency motion in April 2014. In December 2013, Judge Butts had heard extensive evidence and each parties' arguments on Lott's alleged neglect.

---

[3] A court may "take judicial notice of the record in prior related proceedings, and draw reasonable inferences." *Blank v. Collin Cty.*, 710 F. App'x 203, 204 (5th Cir. 2018) (quoting *In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 211 (5th Cir. 1983)).

The second emergency application raised very similar arguments and allegations. The case was then set to be fully tried in less than two weeks. The probate courts, like other trial courts, "have inherent authority to manage their dockets." *In re Mesa Petroleum Partners, LP*, 538 S.W.3d 153, 159 (Tex. App.—El Paso 2017, no pet.).

The record shows that Judge Butts was conscientious toward Mills's well-being; appointed Comstock to investigate the allegations of neglect; gave weight to Comstock's recommendations; heard evidence on Lott's care; responded to the parties' disputes about visitation, communication, and Mills's condition; and set a schedule to fully litigate and resolve the issues raised by Pierce's emergency applications. Based on the record, the court has not found, nor has Johnston identified, evidence supporting any inference that Judge Butts acted with gross neglect in performing her duties. Summary judgment is granted for Judge Butts.

## B.      The Claim Against Dexel

Unlike the claim against Judge Butts, the claim against Dexel raises unsettled issues of Texas law. Johnston has asserted a fiduciary-duty claim against Dexel, alleging that Dexel breached a fiduciary duty to Mills by "'slipping' Lott into his guardian position" and "billing and receiving attorney's fees at $300 per hour in many instances instead of billing at a guardians rate of $100 per hour." (Docket Entry No. 38 at 4, 19). Dexel has responded that Johnston lacks capacity to assert this fiduciary-duty claim; claim preclusion bars Johnston from bringing the claim; and Johnston has failed to identify evidence supporting any inference of a fiduciary-duty breach. (Docket Entry Nos. 79, 92). In requesting briefs on the jurisdiction question, the court explained some of the difficult and unresolved Texas-law questions presented by the claim-preclusion defense. (Docket Entry No. 93).

The court begins by addressing the capacity issue, finding factual disputes material to

determining Johnston's capacity to assert Mills's fiduciary-duty claim. The preclusion issue is next addressed. The court then examines whether, assuming that claim preclusion does not bar Johnston's claim, Johnston has submitted or identified evidence showing a factual dispute material to determining whether Dexel violated a fiduciary duty. The court finds that Johnston has identified evidence showing a genuine factual dispute. Because the unresolved Texas-law questions cannot be avoided, the court finds that the statutory and common-law factors support remanding what is left of the action to state court.

### 1. Capacity

Texas law requires that a plaintiff "have both standing and capacity to bring a lawsuit." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome," and "the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'" *Id.* (quoting 6A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1559, at 441 (2d ed. 1990)). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie*, 925 S.W.2d at 661 (emphasis in original). "The defendant bears the burden to challenge a plaintiff's capacity to sue." *Vertical N. Am., Inc. v. Vopak Terminal Deer Park, Inc.*, No. 14-15-1088-CV, 2017 WL 4197027, at *2 (Tex. App.—Houston [14th Dist.] Sept. 21, 2017, pet. filed). But the "plaintiff bears the burden of proving at trial that he is entitled to recover in the capacity in which he has failed suit." *Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 432 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (quotation omitted).

Dexel challenged Johnston's capacity in his answer to the second amended complaint and his motion for summary judgment. (Docket Entry Nos. 73, 79). Dexel contends that Johnston lacks the capacity to assert Mills's claims against him because she is an heir, not the estate executor. Johnston states that her "suit against Dexel on behalf of [Mills] . . . falls under Johnston's right as an heir . . . to bring a survivorship cause of action . . . for her mother's damages for Dexel's Breach of Fiduciary Duties owed to [Mills]."[4] (Docket Entry No. 88 at 10). When a person dies, that person's estate, including personal injury claims, passes to the heirs or devisees. *Lovato*, 171 S.W.3d at 850. The person's "personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." TEX. CIV. PRAC. & REM. CODE § 71.021(b). A survival action "preserves a claim for the estate rather than creating a new cause of action for those surviving the decedent." *Pluet v. Frasier*, 355 F.3d 381, 384 (5th Cir. 2004); *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 354 (Tex. 1992) ("The survival action, as it is sometimes called, is wholly derivative of the decedent's rights."). "The parties to a survival action seek adjudication of *the decedent's own* claims for the alleged injuries inflicted upon her by the defendant." *Lovato*, 171 S.W.3d at 850 (emphasis in original).

The decedent's estate "has a justiciable interest in the controversy sufficient to confer standing." *Id.* Generally "only the estate's personal representative has the capacity to bring a survival claim." *Id.*; *see Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 212 (5th Cir.

---

[4] To the extent Johnston alleges that Dexel owed her fiduciary duties, separate from Dexel's fiduciary relationship with Mills, the record does not show any "extraordinary" circumstances supporting that Dexel and Johnston had an informal fiduciary relationship. *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, no pet.); *see Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) ("It is well settled that not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." (quotation omitted)). In Johnston's response to Dexel's motion for summary judgment, she neither contended that Dexel owed her a fiduciary duty or pointed to evidence supporting that a fiduciary relationship existed between them. (*See* Docket Entry No. 88 at 9–10).

2016).  An heir has the capacity to assert a survival claim if she "alleges and proves that an administration has been closed, or when no administration is necessary."  *Gonzalez v. Martinez*, No. 01-15-693-CV, 2017 WL 2255649, at *4 (Tex. App.—Houston [1st Dist.] May 23, 2017, no pet.); *see Shepherd v. Ledford*, 962 S.W.2d 28, 31–32 (Tex. 1998) ("Heirs at law can maintain a survival suit during the four-year period the law allows for instituting administration proceedings if they allege and prove that there is no administration pending and none necessary."); *Jordan v. Lyles*, 455 S.W.3d 785, 790–91 (Tex. App.—Tyler 2015, no pet.).

Johnston's capacity to sue depends on what happened in Mills's estate administration in Harris County Probate Court.  While the parties agree that there was an independent administration of Mills's estate, they dispute whether that administration is closed.  The record does not contain the filings from the estate-administration proceedings.  A "court may take judicial notice of 'a document filed in another court to establish the fact of such litigation and related filings,' but generally cannot take notice of the findings of fact from other proceedings because those facts are usually disputed and almost always disputable."  *Ferguson v. Extraco Mortg. Co.*, 264 F. App'x 351, 352 (5th Cir. 2007) (per curiam) (alterations omitted) (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998)); *see, e.g.*, *Brown v. Lippard*, 350 F. App'x 879, 882 n.2 (5th Cir. 2009) (per curiam).  The court may also "take judicial notice of the record in prior related proceedings, and draw reasonable inferences."  *Blank v. Collin Cty.*, 710 F. App'x 203, 204 (5th Cir. 2018) (quoting *In re Missionary Baptist Found. of Am., Inc.*, 712 F.2d 206, 211 (5th Cir. 1983)).  The court takes judicial notice of the filings in Mills's estate administration in Harris County Probate Court, but not of the findings of fact.

Mills's will required an independent estate administration.  (Admitted Will, *Estate of Willie Jo Mills*, No. 434610, at 2–3 (Prob. Ct. No. 4, Harris Cty., Tex., Oct. 28, 2014)).  Her will selected

26

Larry Mills as the executor, giving him "full power and authority over any and all of [her] estate." (*Id.* at 3). In October 2014, after Mills died, the probate court accepted the will and appointed Larry Mills as her estate executor. (Order Admitting Will and Issuance of Letters Testamentary, *Estate of Willie Jo Mills*, No. 434610, at 1–2 (Prob. Ct. No. 4, Harris Cty., Tex., Oct. 28, 2014)).

Within 90 days of appointment, an executor must submit an inventory listing "all estate property that has come into the [executor's] possession or of which the [executor] has knowledge." TEX. EST. CODE § 309.051(a). On May 13, 2015, the probate court sent Larry Mills a notice informing him that he had failed to timely file an inventory, and that if he did not do so within 30 days, the probate court would cancel his "letters" and drop the estate "from the active docket." (Court Letters, *Estate of Wille Jo Mills*, No. 434610 (Prob. Ct. No. 4, Harris Cty., Tex., May 13, 2015)). Larry Mills filed the estate inventory on May 22, listing Mills's only assets as the funds in her court-authorized management trust. (Inventory (Indep.), *Estate of Willie Jo Mills*, No. 434610 (Prob. Ct. No. 4, Harris Cty., Tex., May 22, 2015)).

In early June, the probate court approved the inventory. (Order on Inventory (Indep.), *Estate of Willie Jo Mills*, No. 434610 (Prob. Ct. No. 4, Harris Cty., Tex., June 4, 2015)). After the approval, further actions could not be taken in the probate court except as the Texas Estates Code "specifically and explicitly" permitted. TEX. EST. CODE § 402.001.

On June 23, 2015, the probate court entered an Order stating:

[I]t having been brought to the attention of this Court that the above entitled and numbered estate should be dropped,

IT IS THEREFORE ORDERED that the Clerk drop said estate from the Court's active docket.

(Legacy Event, *Estate of Willie Jo Mills*, No. 434610 (Prob. Ct. No. 4, Harris Cty., Tex., June 23, 2015)). The probate court's docket states that the independent administration is "Closed." (Docket

Sheet, *Estate of Willie Jo Mills*, No. 434610).

Johnston points to the June Order and argues that she has the capacity to bring survival claims against Dexel because the order closed the independent administration.[5]  (Docket Entry No. 88 at 10).  Dexel responds that Larry Mills "continues to serve as the personal representative of [Mills's] estate, at least in part because Johnston has apparently objected to her brother's discharge as the estate's independent executor."  (Docket Entry No. 92 at 7).  Analyzing this disagreement requires looking to the Texas independent-administration procedures.

Texas law permits a person to state in her will that "no other action shall be had in the probate court in relation to the settlement of the person's estate [other] than the probating and recording of the will and the return of any required inventory, appraisement, and list of claims of the person's estate."  TEX. EST. CODE § 401.001(a).  This language creates an independent administration, allowing the estate's executor to take "any action that a personal representative subject to court supervision may take with or without a court order."  *Id.* § 402.002.  After the probate court has entered "the order appointing an independent executor," and "the inventory, appraisement, and list of claims has been filed by the independent executor and approved by the court," the executor or interested parties may not take further actions in the probate court, "except where this title specifically and explicitly provides for some action in the court."  *Id.* § 402.001.  The independent administration's purpose is to "free an estate of the often onerous and expensive judicial

---

[5]  Johnston argues that an administration was unnecessary because the heirs entered a family settlement agreement.  (Document No. 88 at 10).  "[A] family agreement regarding the disposition of the estate's assets can provide support for the assertion that no administration of the decedent's estate is necessary."  *Lovato*, 171 S.W.3d at 851; *see Cooper v. Coe*, 188 S.W.3d 223, 227 (Tex. App.—Tyler 2005, no pet.) ("[N]o formal administration is necessary if the heirs of an intestate decedent make an agreement to distribute the estate and pay the bills.").  Johnston's argument fails because Mills specifically required an independent administration in her will.  (Admitted Will, *Estate of Willie Jo Mills*, No. 4346140, at 2–3).

supervision which had developed under the common law system, and in its place, to permit an executor, free of judicial supervision, to effect the distribution of an estate with a minimum of cost and delay." *Corpus Christi Bank & Tr. v. Alice Nat'l Bank*, 444 S.W.2d 632, 634 (Tex. 1969); *see Eastland v. Eastland*, 273 S.W.3d 815, 821 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("The primary distinction between an independent administration and a dependent administration is the level of judicial supervision over exercise of the executor's power.").

The independent executor's task is to pay claims against the estate and distribute the remaining assets under the will, a settlement agreement, or the Texas Estates Code. *See* TEX. EST. CODE § 403.051(a); *Ertel v. O'Brien*, 852 S.W.2d 17, 20–21 (Tex. App.—Waco 1993, writ denied) ("An independent executor is charged with the duty of paying the claims against the estate subject to the order and classification set out in the Probate Code."); *cf. In re Roy*, 249 S.W.3d 592, 596 (Tex. App.—Waco 2008, no pet.) ("As trustee of the estate's property, the executor is subject to high fiduciary duties."). "An independent administration is to close, and the authority of the personal representative is to terminate, when the estate has been settled." 1 TEXAS PRACTICE GUIDE PROBATE § 5:59 (2018). The executor may file a formal report or notice to close the administration after:

> [A]ll of the debts known to exist against the estate have been paid, or when they have been paid so far as the assets in the independent executor's possession will permit, when there is no pending litigation, and when the independent executor has distributed to the distributees entitled to the estate all assets of the estate, if any, remaining after payment of debts.

TEX. EST. CODE § 405.004. The administration closes 30 days after the executor files the report or notice, unless an interested person objects within that time. *Id.* § 405.007.

Texas law does not require an independent executor to file a closing report or notice. *Id.* § 405.012. The executor may opt to "do nothing once the estate is ready to be closed." CRAIG HOPPER & D'ANA H. MIKESKA, O'CONNOR'S TEXAS PROBATE LAW HANDBOOK Ch. 9-F, § 3 (2018).

The administration will informally close after "all debts and claims against the estate are paid." *Mims-Brown v. Brown*, 428 S.W.3d 366, 375 (Tex. App.—Dallas 2014, no pet.); *see Tex. Commerce Bank-Rio Grande Valley, N.A. v. Correa*, 28 S.W.3d 723, 728 (Tex. App.—Corpus Christi-Edinburg 2000, no pet.) ("An independent administration of an estate is considered closed when the debts have been paid and the property has been distributed and there is no more need for administration." (quotation omitted)). An informal closure "does not discharge the [independent executor] or terminate her power, authority, or duties unless there is proof that the administration was in fact closed, nor does it relieve the representative from her liabilities." HOPPER & MIKESKA, O'CONNOR'S TEXAS PROBATE LAW HANDBOOK Ch. 9-F, § 3.

On an independent administration's closure, whether formal or informal, the executor remains liable for "any mismanagement of the estate" or "false statements contained in the report or notice." TEX. EST. CODE § 405.007(b). Through a declaratory judgment action, the executor may seek discharge from liability for "matters relating to the past administration of the estate that have been fully and fairly disclosed." *Id.* § 405.003(a). The probate court "may require the independent executor to file a final account that includes any information the court considers necessary to adjudicate the independent executor's request for a discharge of liability." *Id.* § 405.003(c). Before seeking discharge, the executor must have distributed "any of the remaining assets or property of the estate that remain[] in the independent executor's possession after all of the estate's debts have been paid, except for a reasonable reserve of assets that the independent executor may retain in a fiduciary capacity pending court approval of the final account." *Id.* § 405.003(d).

After the probate court's June 2015 Order dropping the case from the active docket, the docket does not show any action until May 2017, when Larry Mills filed a "Final Account and condition of the estate," intending to seek a discharge from liability. (Final Account – Posting,

*Estate of Willie Jo Mills*, No. 434610 (Prob. Ct. No. 4, Harris Cty., Tex., May 3, 2017)).

The final account covered transactions from May 22, 2015 to January 25, 2017. (Final Account (Indep.), *Estate of Willie Jo Mills*, No. 434610, at 1 (Prob. Ct. No. 4, Harris Cty., Tex., May 1, 2017)). During that period, no claims had been presented for payment, no new estate property had been discovered, and $1,543,556.99 had been distributed. (*Id.* at 2–4). The final account listed the check number, payee, and amount of each distribution, but not the distribution dates. (*Id.*). The final account stated that the estate contained $88,766.19 in leftover assets. (*Id.* at 4). Larry Mills requested authorization to distribute this money to himself, Johnston, and Pierce. (*Id.*). He asked the probate court to approve the final account, to "ratify all unapproved expenditures," to "order the distribution of all remaining Estate funds," and to discharge him. (*Id.* at 5).

The next month, June 2017, Larry Mills applied to be discharged from liability for Mills's estate administration. His application stated that he was "the duly appointed and qualified Independent Executor of the Estate of Willie Jo Mills." (Application Discharging Representative, *Estate of Willie Jo Mills*, No. 434610, at 1 (Prob. Ct. No. 4, Harris Cty., Tex., June 26, 2017)). The application stated that Johnston and Piece had sued Larry Mills twice before based on "unfounded and specious claims," and that he had "no desire to be sued again by his sisters." (*Id.* at 2). Larry Mills said that he had "previously distributed the bulk of the Estate of Willie Jo Mills" to Johnston and Pierce. (*Id.*). He attached the final account to his application.

Johnston objected to both the final account and application for discharge. (Special Exceptions, *Estate of Willie Jo Mills*, No. 434610 (Prob. Ct. No. 4, Harris Cty., Tex., Aug. 15, 2017)). She noted that "[t]his Estate was opened on October 13, 2014; the Executor, Larry Mills, was appointed and authorized Letters Testamentary on October 28, 2014[;] and this Estate was dropped from the Court's active docket on June 22, 2015." (Objection, *Estate of Willie Jo Mills*,

No. 434 610, at 1 (Prob. Ct. No. 4 , Harris Cty., Tex., May 19, 2017)). She alleged that "[d]uring the time this estate has been opened, and as recently as this month, May, 2017, Executor has failed and refused to provide . . . information regarding the propriety of Executor's disbursements from the estate." (*Id.* at 1–2). Johnston urged the probate court to deny Larry Mills's application and order Larry Mills to provide documents related to the disbursements. The probate court scheduled hearings on the final account, discharge application, and objections on August 21, 2017, and November 16, 2017. The probate docket does not indicate whether those hearings were held.

The probate docket contains conflicting evidence on whether the June 23 Order closed the estate administration. The Order stated that Mills's estate was dropped from the court's active docket, but not that the estate was closed or dismissed. Removing a case from the active docket, without more, suggests that the case could be reinstated to that docket. The Order came soon after the court had approved the estate inventory, after which actions could not be taken in the probate court unless specifically authorized by the Texas Estates Code. When the Order issued, the probate court docket contained no indication that Larry Mills had paid all the estate claims or distributed the estate assets, both prerequisites for closing an estate. *See* Tex. Est. Code § 405.004; *Mims-Brown*, 428 S.W.3d at 375. Additionally, in June 2017, two years after the June 2015 Order, Larry Mills sought discharge from liability for the estate administration. His filing of the final account is not enough to close the estate, and the probate court has yet to grant or deny his application for discharge. *In re Estate of Hanau*, 806 S.W.2d 900, 903 (Tex. App.—Corpus Christi-Edinburg 1991, no writ) ("The filing of an unverified formal inventory and appraisal of the estate, along with a list of the claims of and against the estate will not close an estate.").

That said, the June 23 Order removes Mills's estate administration from the probate court's active docket. The docket sheet states the administration's status as "Closed." To be discharged

from liability, Larry Mills would have needed to submit an application and final account, even if the estate administration closed in June 2015. TEX. EST. CODE § 405.007(b).

Based on the current record, the court finds a factual dispute material to determining whether the probate court closed Mills's estate administration in June 2015. If the administration was closed, Johnston would have the capacity to assert Mills's survival claims, including one for fiduciary-duty breach. If the administration was not closed, Johnston would not have the capacity to do so. Summary judgment cannot be granted, given the current record.[6]

### 2. Preclusion

Johnston has alleged that Dexel breached his fiduciary duty to Mills by "slipping Lott into his guardian position" and "billing and receiving attorney's fees at $300 per hour in many instances instead of billing at a guardian's rate of $100 per hour." (Docket Entry No. 38 at 4, 19). Dexel argues that claim preclusion bars these claims because Johnston was able to oppose Lott's appointment as guardian and Dexel's fee requests during the probate proceedings, and Johnston could have appealed the probate court's decisions on them, but chose not to do so. Johnston responds that Dexel did not timely serve her with his final report or his application to resign, and that she had no opportunity to oppose either Lott's appointment or Dexel's resignation. (Docket Entry No. 88 at 11–13). Johnston made no argument as to why she may challenge Dexel's fees. (*Id.*).

Claim preclusion bars claims that have, or might have, been litigated in an earlier suit.

---

[6] *See City of Austin v. Lopez*, No. 03-18-107-CV, 2018 WL 3235585, at *2 (Tex. App.—Austin July 3, 2018, no pet.) ("Lack of capacity to sue, unlike standing, is not a jurisdictional defect."); *Barcroft v. Cty. of Fannin*, 118 S.W.3d 922, 924 (Tex. App.—Texarkana 2003, no pet.) ("A lack of capacity is not jurisdictional.").

*Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The party asserting claim preclusion must show that: a court of competent jurisdiction made a final determination on the merits; the actions involved the same parties or those in privity with them; and the second action asserts claims that were raised or could have been raised in the first action. *Igal v. Brightstar Info. Tech. Grp., Inc.*, 250 S.W.3d 78, 86 (Tex. 2008) (citing *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007)). "The doctrine seeks to bring an end to litigation, prevent vexatious litigation, maintain stability of court decisions, promote judicial economy, and prevent double recovery." *Daccach*, 217 S.W.3d at 449.

"Generally people are not bound by a judgment in a suit to which they were not parties." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *Taylor v. Sturgell*, 553 U.S. 880, 893 (2008) ("[O]ne is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940))). Texas law recognizes "an exception to this rule by forbidding a second suit arising out of the same subject matter of an earlier suit by those in privity with the parties to the original suit." *Amstadt*, 919 S.W.2d at 652–53. "Privity exists if the parties share an identity of interests in the basic legal right that is the subject of litigation." *Id.* at 653.

This issue presents novel state-law questions. Dexel and Johnston were involved in the guardianship proceeding before Judge Butts in the Harris County Probate Court. Under Texas law, Johnston was an "interested person" in that proceeding. TEX. EST. CODE § 1002.018. This status permitted, but did not require, Johnston to oppose a guardian's appointment and to challenge the guardian's actions or motions. *See* TEX. EST. CODE §§ 55.001; 1055.001(a); 1155.008. During the probate proceedings, Johnston did not oppose Lott's guardian application or challenge Dexel's fee

34

motions, and she did not assert a fiduciary-duty claim as to either. Dexel argues that claim preclusion bars Johnston from now asserting her fiduciary-duty claims because, as an interested person, she could have raised them during the probate-court proceedings.

This argument implicates unsettled Texas-law questions. Is an interested person a "party" in a guardianship or estate administration proceeding for claim-preclusion purposes? When does a guardianship or an estate administration, neither adversarial by nature, count as a previous "action" for claim preclusions? Neither the Texas Supreme Court nor the intermediate Texas appellate courts have addressed or answered these questions.

The Texas Estates Code defines an interested person as "an heir, devisee, spouse, creditor, or any other having a property right in or claim against an estate being administered" and any person "interested in the welfare of an incapacitated person." TEX. EST. CODE § 1002.018. A person does not need to apply for interested-person status, and the Texas Estates Code does not provide procedures for opting out, although a plaintiff must "plead and prove his status as an interested person." *Estate of Matthews III*, 510 S.W.3d 106, 114 (Tex. App.—San Antonio 2016, no pet.). Interested persons have procedural rights to notice of filings, hearings, and probate-court actions; to appear at hearings; to file motions, applications, pleadings, or objections; and to appeal final probate-court actions. *See, e.g.*, TEX. EST. CODE §§ 1055.001; 1055.003; 1051.252; 1051.102(b); 1151.056; 1151.105(b); 1157.054; 1157.058; 1203.004.

As Texas law conceives them, interested persons are not parties to litigation in the usual rule-defined roles. Because a guardianship is designed "to promote and protect the well-being of the incapacitated person," not to adjudicate adversarial disputes between parties, the process permits the input of family, friends, caretakers, and those with economic interests at stake. TEX. EST. CODE

§ 1001.001(a); *see Franks v. Roades*, 310 S.W.3d 615, 627 (Tex. App.—Corpus Christi-Edinburg 2010, no pet.) ("Guardianships are not inherently adversarial proceedings."). Those parties need not be formally joined by service or court order, but they are authorized to become involved. Only a proposed ward, that person's immediate family, and that person's caregivers must be served with notice of guardianship proceedings. *See* TEX. EST. CODE § 1051.103. While the County Clerk must issue a citation informing "all persons interested in the welfare of the proposed ward to appear at the time and place stated in the notice if the persons wish to contest the application," those persons need not be formally served. *Id.* § 1051.102(b). Interested persons may request, at their own cost, that the County Clerk inform them "of all, or any specified, motions, applications, or pleadings filed with respect to the proceeding." *Id.* § 1051.252.

Given these procedures, an interested person might not receive actual notice of the guardianship, or know—actually or constructively—what has happened in the proceedings. An interested person might not have counsel, or understand the need for counsel, given that the proceedings are not adversarial. While the Texas Supreme Court has held that interested persons are "charged with notice of the contents of probate records," that holding concerns the accrual date for fraud claims, not preclusion. *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981); *see also Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 59 (Tex. 2015).

These considerations advise against a rule that would extend claim preclusion to all interested persons, no matter their involvement in, or notice of, the proceedings. But a rule excluding from preclusion interested persons who have actively participated in litigating the probate proceedings runs the risk of subjecting defendants to vexatious litigation and double recovery, while undermining judicial efficiency and stability.

The rule should perhaps fall somewhere between these extremes, but the question is where. Answering that question requires examining the competing interests in court access, judicial efficiency, fairness, and, ultimately, the stakes involved in probate proceedings.

There is also the question whether and when probate proceedings count as an action under the Texas Supreme Court's transaction test. *See Barr v. Resolution Tr. Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 631 (Tex. 1992) ("A subsequent suit will be barred if it arises out of the same subject matter of a previous suit and which through the exercise of diligence, could have been litigated in a prior suit."); *cf. In Guardianship of Macer*, 558 S.W.3d 222, 226 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("A probate proceeding consists of a continuing series of events, and later decisions regarding administration of an estate or guardianship of a ward necessarily may be based on earlier decisions in the proceeding." (quotation omitted)).

*Erie* guesses are never wholly satisfactory, and there is little reliable basis for this court to predict how Texas might answer these and related questions. The questions at stake mean that this court is not the best forum to decide them on behalf of the State of Texas. *See Parsley*, 972 F.2d at 589 ("Aside from the state courts' superior familiarity with their respective jurisdictions' law, the federal courts' construction of state law can be 'uncertain and ephemeral.'" (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 122 n.32 (1984)).

One last way to avoid remanding this set of issues remains. The court examines whether, assuming that Johnston's claims are not precluded, summary judgment may be granted on the ground that Johnston has not identified or submitted evidence supporting a factual dispute material to whether Dexel has breached a fiduciary duty.

### 3.    Summary Judgment

Johnston alleged that Dexel breached a fiduciary duty to Mills by billing his attorney rate for non-legal services. (Docket Entry No. 38 at 19). "Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages." *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017). "The fiduciary duty is one of integrity, loyalty, and the utmost good faith." *Byrd v. Woodruff*, 891 S.W.2d 689, 707 (Tex. App.—Dallas 1994, writ denied).

Dexel and Mills had a fiduciary relationship. *See id.* at 706 ("[T]he law recognizes the fiduciary duty of a guardian of a ward or the personal representative of an estate."); *State v. Whitaker*, 638 S.W.2d 189, 191 (Tex. App.—Waco 1982, no writ) ("[T]here exists a fiduciary relationship between the guardian and the ward."). Dexel had the duty to manage Mills's affairs, including her estate, with integrity and in good faith. Under Texas law, Dexel was not "entitled to payment of attorney's fees for guardianship services that are not legal services." TEX. EST. CODE § 1155.052(b). Johnston alleged that Dexel violated this rule, in breach of his fiduciary duty, by charging attorney's fees for non-legal services. *See, e.g.*, *Stallworth v. Ayers*, 510 S.W.3d 187, 191 n.3 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("A claim for breach of fiduciary duty by a lawyer involves the integrity and fidelity of an attorney and focuses on whether an attorney obtained an improper benefit from representing the client." (quotation omitted)).

Dexel was appointed as Mills's permanent guardian on July 22, 2009. (Docket Entry No. 10-7). The record shows that Dexel submitted applications for guardian fees and expenses, along with billing statements, to the probate court for approval. (*See* Docket Entry Nos. 38-5, 79-14). For part of Dexel's time as guardian, the billing statements show that Dexel charged Mills at either an attorney's rate, $300 per hour, or at a legal-assistant rate, $100 per hour. (*Id.*). Dexel did not start

billing a guardian rate, distinct from the attorney and legal-assistant rates, until January 31, 2011, when he filed an amended application for guardian's fees and expenses that had a handwritten column for guardian hours. (*Id.* at 13–17). In the billing statement for June 21, 2011, to July 28, 2011, Dexel did not include the column for guardian hours. (*Id.* at 18–21).

The billing statements show that Dexel charged an attorney hourly rate for non-legal services that appear related to his guardian role. For example, Dexel requested his attorney's rate for:

> Discussion with Chris Holland about private physical therapist and options; scheduled conference.
>
> Visit with Ward at care home; reviewed her preference on care taker; reviewed with Ward her 867 Trust statement; discussed assets.
>
> Discussion with daughter on Christmas gifts to family; received email list; telephone call from Deborah Mills on beer issue; telephone call to care home on beer issue and new shower chair; letter to trust authorizing gifts.
>
> Telephone calls to Silverado and SCS & Associates; letter regarding alcoholic beverages to all and family.
> Long discussion with Sherry Johnston.
>
> Telephone call from GSL Care Management to inform Guardian that blood transfusion will not be performed as Ward's hemoglobin levels are higher; they have been giving her fluids which helped her condition, however, the doctor wants to keep her overnight and to check her levels in the morning; family members have arrived; sitter will remain with Ward overnight.
>
> Prepared Guardian's Annual Report on Location, Condition and Well-Being of Ward.

(Docket Entry No. 38-5 at 3–4, 20–21). Dexel often charged his attorney rate to arrange payments to and from Mills's trust, a service which does not appear legal in nature. (*Id.*). While the probate court approved Dexel's fee requests, that approval, absent claim preclusion, would not alleviate Dexel from his fiduciary responsibilities to Mills or resolve whether he met them.

Dexel denies that the billing statements show a violation of his fiduciary duties, pointing to the probate court's approvals of his fee applications as evidence. Based on this record, the court finds that there are factual disputes material to determining whether Dexel billed Mills's estate at his attorney rate for non-legal, guardian services. Because the court has found at least one factual dispute material to deciding if Dexel breached a fiduciary duty owing to Mills, summary judgment cannot be granted for Dexel on this record.

Dexel's claim-preclusion defense cannot be avoided. The defense presents unsettled Texas-law questions that touch on family relationships, estate management, the Texas probate system, and the care of some of the most vulnerable members of our community. They are questions that the Texas courts are better positioned to answer. Because Johnston's federal-law claims have been dismissed, and the one remaining claim presents unsettled Texas-law questions, the court remands that issue, the only remaining claim in this action, to the 253rd Judicial District Court for Liberty County, Texas.

## IV. Conclusion

Judge Butts's motion for summary judgment is granted. (Docket Entry No. 78). The remaining claim against Dexel, for breach of his fiduciary duty in seeking attorney's fees for his work as Mills's guardian from December 2008 to June 2013, is remanded. All other claims have been dismissed, with prejudice.

SIGNED on March 14, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge